UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| ALEX MONTOYA; REX SHIRLEY; PHILIP PRESSEL; and AARON GRESSON, individually, and on behalf of all others similarly situated, Plaintiffs, v. CITY OF SAN DIEGO, a public entity; and DOES 1-100, Defendants. | Case No.: 19cv0054 JM(BGS) **ORDER ON MOTION FOR PRELIMINARY INJUNCTION** |
|---|---|

On October 2, 2020 Plaintiffs filed a Motion for Preliminary Injunction against the City of San Diego (the "City") to enjoin the City from allowing pedestrian rights-of-way to be obstructed by dockless vehicles in violation of the Americans with Disabilities Act ("ADA"), the Rehabilitation Act, and California's Disabled Persons Act ("DPA"). (Doc. No. 106.) The motion has been fully briefed and the court finds it suitable for submission on the papers and without oral argument in accordance with Civil Local Rule 7.1(d)(1). For the reasons set forth below, Plaintiffs' motion is denied.

**I.    Background**

On January 9, 2019, Plaintiffs filed a putative class action complaint asserting claims for violations of the ADA, 42 U.S.C. § 12101 *et seq*., section 504 of the Rehabilitation Act,

29 U.S.C. § 794 *et seq.,* California Civil Code section 51, *et seq.,* (the "Unruh Act"), California Civil Code section 54, *et seq.,* (the "DPA"); California Government Code section 4450, *et seq.,* and California Government Code section 11135, *et seq.* (Doc. No. 1.)

On March 21, 2019, Plaintiffs filed the First Amended Class Action Complaint ("FAC"). (Doc. No. 14.) The court issued a detailed order denying the City's motion to dismiss the FAC but granting the motions to dismiss brought by the private entities that rent the dockless vehicles to third party individuals, which Plaintiffs categorized as the "Dockless Vehicle Defendants." (*See* Doc. No. 89.) Plaintiffs chose not to amend their claims against the Dockless Vehicle Defendants.

Following a joint motion to amend, Plaintiffs filed the Second Amended Complaint ("SAC"). (Doc. Nos. 95, 96, 97.)

The SAC alleges that Plaintiffs, who are individuals with disabilities, had found their access to San Diego's sidewalks diminished by the proliferation of dockless electric vehicles currently in use in the City. (SAC ¶¶ 1, 2, 12, 13, 14, 15.) They allege that people using the dockless electric vehicles either travel on the sidewalks or block paths of travel because the vehicles are discarded in the middle of sidewalks or at other rights-of-way, making it difficult for people with disabilities to safely traverse the pathways. (*Id.* at 2, 3.[1]) Further, the SAC alleges that as usage and abandonment of these vehicles and the speed at which they travel increases, Plaintiffs are denied safe, equal, and full access to the sidewalks. (*Id.* ¶¶ 20-29.) In Plaintiffs' words, the vehicles' "burgeoning proliferation and uncurbed growth comes at the detriment of the rights of all disabled persons with mobility and/or visual impairments who are residents and visitors of the City of San Diego, causing Plaintiffs injury, severe anxiety, diminishing their comfort and discriminating against them based on their disabilities…." (*Id.* at ¶ 30.) Plaintiffs direct allegations at the City regarding its responsibilities as a municipality and the duty it has to maintain the sidewalks.

---

[1] Document numbers and page references are to those assigned by CM/ECF for the docket entry.

(*See, e.g., id.* at ¶¶ 31-34, 37, 41-42, 53, 55-61, 68-72, 76-79, 83, 87-91, 97-100, 107-108, 111.)

On May 8, 2020, the City filed its answer to the SAC. (Doc. No. 102.)

On October 1, 2020, Plaintiffs filed a motion for leave file a third amended complaint. (Doc. No. 105.) The City opposed the motion, (Doc. No. 110) and the court denied the request. (Doc. No. 132.)

On October 2, 2020, Plaintiffs filed the motion for preliminary injunction. (Doc. No. 106.) The City filed its opposition[2], (Doc. Nos. 126, 127) and Plaintiffs filed their reply (Doc. No. 131).

## II.     Legal Standard

Injunctive relief may only be granted upon a showing of "irreparable injury and the inadequacy of legal remedies." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982). *See also Winter v. Natural Res. Def. Council, Inc.,* 555 U.S. 7*,* 20 (2008) (The issuance of a preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."); *Stanley v. Univ. of So. Calif.*, 13 F.3d 1313, 1320 (9th Cir. 1994). A plaintiff must show "that he faces a real or immediate threat," as opposed to a mere possibility, that he will suffer substantial or irreparable injury. *See, e.g., Midgett v. Tri-County Metro. Transp. Dist. Or.*, 254 F.3d 846, 850 (9th Cir. 2001). Thus, "plaintiffs seeking a preliminary injunction face a difficult task in proving that they

---

[2] Along with its opposition, the City asked the court to take judicial notice of: (1) Exhibit A, San Diego Municipal Code sections 83.0301 *et seq.*; (2) Exhibit B, San Diego Emergency Order, effective November 14, 2020; (3) Exhibit C, the contract between the City of San Diego and Sweep, Inc.; and (4) Exhibit D, a Consumer Reports Article. (Doc. No. 126-1.) The City makes the request pursuant to Federal Rule of Evidence 201. Plaintiffs do not oppose the request. Having only consider Exhibits A and C in ruling on the motion, the court takes judicial notice of these two exhibits and declines to take judicial notice of Exhibits B & D. *See Johnson v. DBTA, LLC* 424 F. Supp. 3d 657, 662 (N.D. Cal. 2019) ("Public records maintained on government websites are generally subject to judicial notice.").

are entitled to this 'extraordinary remedy.'" *Earth Island Institute v. Carlton*, 626 F.3d 462, 469 (9th Cir. 2010) (citing *Winter*, 129 S. Ct. at 376)).

Under the traditional standard, in order to obtain a preliminary injunction, the party seeking relief must demonstrate: (1) that he is likely to succeed on the merits; (2) that he is likely to suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in his favor; and (4) that an injunction is in the public interest. *Winter*, 555 U.S. at 20. Courts within the Ninth Circuit can also apply a variant of this standard known as the "sliding scale" which provides "if a plaintiff can only show that there are 'serious questions going to the merits' – a lesser showing than likelihood of success on the merits-then a preliminary injunction may still issue if the 'balance of hardships tips *sharply* in the plaintiff's favor,' and the other two *Winter* factors are satisfied." *Alliance for the Wild Rockies v. Pena*, 865 F.3d 1211, at 1217 (9th Cir. 2017) (quoting *Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1291 (9th Cir. 2013).

### III. Discussion

Plaintiffs contend that a preliminary injunction against the City will protect Plaintiffs' physical safety and prevent the irreparable loss of dignity, independence, and deprivation of Plaintiffs' civil rights during the pendency of this action. They assert that people with mobility and visual impairments are being disproportionately burdened and their independence impeded by the City's acquiescence in allowing the public sidewalks to be turned into showrooms, rental stores, and store locations for the dockless vehicle companies. Plaintiffs argue that "[d]ue to the ubiquitous presence of dockless vehicles, people with mobility and visual impairments are denied equal access to and equal enjoyment of the City's system of sidewalks, cross walks, transit stops and other walkways." (Doc. No. 106-1 at 8.) In support of their request, Plaintiffs have provided individual declarations (Docs. Nos. 106-3 – 106-6, 131-1 – 131-4) and have provided a

report by an accessibility expert, Mr. Jeff Mastin[3], (Doc. No. 106-2), who assessed the dockless vehicle impact on the public system of sidewalks, transit stops, crosswalks, and curb ramps. Attached to their reply brief is an additional declaration from Mr. Jonathan Freeman, PhD, a founding member of Safe Walkways, a group that was formed by citizens in 2018 in response to "the dangers created for pedestrians by dockless motorized scooters and bikes made available for rent in San Diego." (Doc. No .131-5 at ¶ 2.)

As to the relief being requested, without providing much in the way of specifics, Plaintiffs conclude by asking the court to:

> provide the relief that Plaintiffs need to meaningfully access public sidewalks without encumbrance and without risk to their safety, so that they have the same ability to independently and meaningfully enjoy the benefits of the sidewalk as do those without disabilities. The Court should enjoin the City from permitting dockless vehicles to be present on the sidewalk or other pedestrian access ways in any fashion."

(Doc. No. 160-1 at 34.) In essence, the Plaintiffs are asking the court for an order prohibiting the City from permitting or authorizing dockless vehicles to be present on public sidewalks, crosswalks, transit stops, and other pedestrian walkways, or access ways anywhere within the City and under the City's jurisdiction.

In opposition, the City counters that Plaintiffs' failure to seek the injunction for over two years belies their claims that they now need urgent judicial intervention to avoid irreparable harm. (Doc. No. 126 at 9-11.) The City also contends that Plaintiffs have neither demonstrated that they are likely to succeed on the merits nor that they will be irreparably harmed. (*Id*. at 13-18.) The City also argues that granting Plaintiffs motion will harm the public interest. (*Id*. at 11-13.) The City has also filed a declaration from an

---

[3] While the court appreciates Mr. Mastin's opinions on the subject, it should be noted that he visited San Diego on March 7 – 10, 2019 and again on October 12-13, 2019. (Doc. No. 106-2 at ¶ 2.)

accessibility expert, (Doc. No. 127) and a declaration by a City of San Diego Investigator (Doc. Nos. 127-1 – 127-6) in support of its opposition to Plaintiffs' motion for preliminary injunction.

### (a) Delay Undercut Claims

The City argues that Plaintiffs' long delay in bringing this motion "belies their claim of irreparable harm and urgent need for judicial intervention." (Doc. No. 126 at 9.) Plaintiffs counter that their delay in filing for the injunction was justified, and that the delay should not prevent the issuance of the injunction, especially in light of the fact that they face "ongoing, cumulative harm." (Doc. No. 131 at 5.)

While Plaintiffs attempt to downplay the delay, it is a fact the court must consider. As the Ninth Circuit has explained: "[a]lthough, 'delay by itself is not a determinative factor in whether the grant of interim relief is just and proper,' that the [plaintiff] tarried so long before seeking this injunction is nonetheless relevant in determining whether relief is truly necessary ... [because it] 'implies a lack of urgency and irreparable harm.'" *Miller for & on behalf of NLRB v. Cal. Pac. Med. Ctr.,* 991 F.2d 536, 544 (9th Cir. 1993) (quoting *Aguayo ex rel. NLRB v. Tomco Carburetor Co.*, 853 F.2d 744, 750 (9th Cir. 1988) and *Oakland Tribune, Inc. v. Chronicle Pub. Co.*, 762 F.2d 1374, 1377 (9th Cir. 1985)). However, "tardiness is not particularly probative in the context of ongoing, worsening injuries." *Arc of Cal. v. Douglas*, 757 F.3d 975, 990 (9th Cir. 2014).

Here, the original complaint was filed on January 9, 2019, with Plaintiffs not moving for injunctive relief until October 2, 2020, 21 months after filing suit. Plaintiffs contend they refrained from filing the injunction because they were in months long settlement negotiations with the City. But those negotiations only began after the SAC was filed. (*See* Doc. No. 129-1.) A review of the docket reveals that the SAC was filed on April 15, 2020, 15 months after the original complaint. As to the consideration given to the Deputy City Attorney's illness, this also occurred following the filing of the SAC. (*See id*.) Therefore, the justifications propounded by Plaintiffs do not account for the 15-month interval between when they initiated this lawsuit and began settlement negotiations.

6

19cv0054 JM(BGS)

1  Moreover, Plaintiffs have consistently alleged that the dockless vehicles have created
2  hazards on the sidewalks, crosswalks, transit stops and other walkways since the very
3  beginning.  Thus, the harm they have been exposed to has been present since the outset.
4  The failure to seek injunctive relief is, therefore, probative, appears to have been a tactical
5  decision, and implies a lack of urgency that the court must consider.  Accordingly, the court
6  finds this factor weighs against Plaintiffs.

### (b) Immediate Irreparable Harm

Plaintiffs assert they will suffer irreparable harm in the absence of injunctive relief because they are deprived of their ability to safely traverse the City's sidewalks and that they have been stripped of their dignity and independence due to their disabilities.  (Doc. No. 106-1 at 16-17.)  Plaintiffs also point to the recent proliferation in the number of dockless vehicles to support their claim that an injunction is necessary, arguing that this uptick increases the chances that the sidewalks will once again become obstructed.  In opposition, the City argues that Plaintiffs have failed to demonstrate imminent, irreparable harm.  (Doc. No. 126 at 13.)

Plaintiffs seeking preliminary relief are required to demonstrate that irreparable injury is likely in the absence of an injunction. *Winter,* 555 U.S. at 20.  The Ninth Circuit has elucidated that "[s]peculative injury does not constitute irreparable injury sufficient to warrant granting a preliminary injunction. A plaintiff must do more than merely allege imminent harm sufficient to establish standing; a plaintiff must *demonstrate* immediate threatened injury as a prerequisite to preliminary injunctive relief." *Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011, 1022 (9th Cir. 2016) (quoting *Caribbean Marine Servs. Co., Inc., v. Baldridge*, 844 F.2d 668, 674 (9th Cir. 1988)).

The parties have each submitted expert reports that contain countless photographs of San Diego's sidewalks.  (See Doc. No. 106-2, 127 – 127-6).  Plaintiffs' expert has submitted photographs depicting dockless scooters and bikes parked illegally, blocking access on sidewalks and curb ramps, and individuals riding the scooters on sidewalks.  (Doc. Nos 106-2 at 72-127).  Attached to the declarations of Plaintiffs Rex Shirley and

Philip Pressel are photographs documenting their experiences of traveling around the City on mobility scooters and encountering instances where dockless vehicles blocking their paths of travel and riders of scooters were on the sidewalks. (*See* Doc. Nos. 106-5 at 8-23, 131-1 at 3-8.) Similarly, Jonathan Freeman included numerous photographs along with the declaration he filed in support of Plaintiff's motion. (Doc. No. 131 at 131-5 at 23, 25, 27, 31, 33, 35, 37, 39, 41, 43, 45.) In opposition, Defendant has submitted photographs depicting clear sidewalks, individuals with disabilities safely and easily traversing the sidewalks, and dockless scooters left neatly in designated corrals.  (Doc. Nos. 127 at 21-27, 127-2 at 2-7, 127-3 at 2-7, 127-4 at 2-7, 127-5 at 2-7, 127-6 at 2-7.) In other words, for every picture Plaintiffs have submitted in support of their claims, the City has countered with one supporting its position. (*Compare* Doc. Nos 106-2 at 72-127, 106-5 at 8-23, 131-1 at 3-8, 131-5 at 23, 25, 27, 31, 33, 35, 37, 39, 41, 43, 45 *with* Doc. Nos. 127 at 21-27, 127-2 at 2-7, 127-3 at 2-7, 127-4 at 2-7, 127-5 at 2-7, 127-6 at 2-7.) The court is not surprised by this conflicting evidence considering the fact that the dockless vehicles are constantly moving objects and their presence in one location is not fixed.

The named Plaintiffs' declarations detail specific encounters with dockless vehicles and the users of them. (Doc. Nos. 106-3 – 106-6, 131-1 – 131-2.) While the court is sympathetic to Plaintiffs, they have described several frustrating, isolated inconveniences that have impeded their paths of travel. But all members of the general public are subjected to the nuisance the presence of these dockless vehicles on sidewalks pose when ridden by an individual disregarding the user instructions and the traffic laws or when carelessly abandoned by the user - facts Plaintiffs themselves even acknowledge. (*see* Doc. No. 106-1 at 16.) The City cannot guarantee that individuals with disabilities will not encounter some impediments when they move around on the sidewalks.  The realities of everyday life mean that a "perfect" ADA accessible sidewalk does not exist in the constantly changing variable that is city living.  This is perhaps best illustrated when one considers the use of bicycles and skateboards.  There are countless signs posted on city streets designed to prevent cyclists and skateboarders from riding on sidewalks, and bike riding

and skateboarding is prohibited in certain areas, yet individuals will choose to disregard or ignore such signage. Likewise, people and businesses still place or abandon items on the sidewalks that make it difficult for individuals with disabilities to move efficiently around the city. All of these actions create transitory hazards for members of the public, and the City relies on its regular enforcement efforts to control compliance. But it is not practicable to expect that compliance can be achieved every second of every day.

Plaintiffs' position also ignores the efforts the City has taken to address the influx of dockless vehicles into San Diego. It has: (1) adopted two ordinances; (2) required rental companies to obtain a permit before it can operate; and (3) entered into a contract with Sweep, Inc., that authorizes Sweep to immediately impound any shared mobility device that may impede disabled access to public rights-of-way. (*See* https://www.sandiego.gov/sites/default/files/41_rfp_10089596-20-b_shared_mobility_device_services_-_contract_-_final.pdf; Doc. No. 126-2 at ¶12;[4]) One rental company, Bird, has also taken steps to educate riders with digital instructions and animated illustrations on how to park the dockless vehicles to avoid obstructing pedestrian rights-of-way, has educated riders on the ADA and city safety regulations and offered incentives to riders to park dockless vehicles in designated corrals. (*See generally* Doc. No. 126-3.) To be clear, the court is not suggesting that the City's solution is perfect, it simply illustrates that the City has been working toward finding a solution. This fact mitigates against the court imposing the drastic relief requested by Plaintiff at this stage of the proceedings. Accordingly, the court finds this factor weighs against Plaintiffs.

**(c) Public Interest**

Plaintiffs maintain that preventing discrimination against people with disabilities serves to uphold the purpose of the ADA and that "[a] completely accessible walking city

---

[4] The contract, entered into in October 2019, requires Sweep to perform its enforcement duties 10 hours a day, 7 days a week. (Doc. No. 126-2 at ¶ 11.) The rental companies have 3 hours to remove all other improperly placed devices. (*Id*. at ¶ 12.)

that is equally and fully accessible to every person with disabilities is assuredly in the public interest." (Doc. No. 106-1 at 19.)  The City counters that issuing an injunction would frustrate the will of San Diegans and the entire state of California. (Doc. No. 126 at 12.)  The City also argues that enjoining it from enforcing the municipal code would not resolve Plaintiffs' complaints. (*Id.*)

A court considering a request for preliminary injunction must "weigh in its analysis the public interest implicated by [an] injunction." *Arc of Cal* 757 F.3d at 991 (quoting *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1139 (9th Cir. 2009)).  "When the reach of an injunction is narrow, limited only to the parties, and has no impact on non-parties, the public interest will be 'at most a neutral factor in the analysis rather than one that favor[s] [granting or] denying the preliminary injunction." *Stormans*, 586 F.3d at 1138-39.  If, however, the impact on an injunction reaches beyond the parties, carrying with it a potential for public consequences, the public interest will be relevant to whether the district court grants the preliminary injunction." *Id.* at 39.  *See also Fund for Animals v. Lujan*, 962 F.2d 1391, 1400 (9th Cir. 1992).  ("In cases where the public interest is involved, the district court must also examine whether the public interest favors the plaintiff."); *Weinburger*, 456 U.S. at 312-13 ("[When] an injunction is asked which will adversely affect a public interest … the court may in the public interest withhold relief until a final determination of the rights of the parties, though some postponement may be burdensome to plaintiff.").

Here, in asking the court to order that all dockless vehicles be removed from the City limits while this lawsuit proceeds, Plaintiffs are asking for relief that goes beyond maintaining the status quo, they are asking for the final relief requested in the SAC.  The overbreadth of this request is evidenced by the fact that it reaches non-parties and implicates issues of broader public concern that could have public consequences.  Additionally, the California State legislature encourages the use of the dockless vehicles in question and the people of San Diego have also spoken on the issue.  The San Diego City Council has enacted an ordinance allowing dockless vehicle companies to operate within the San Diego City limits.  Its purpose is to "establish a process for permitting the operators

[of dockless scooters] to achieve the City's goals of encouraging alternate methods of transportation while protecting public health and safety." San Diego Municipal Code §83.0301; *see also* CAL. VEH. CODE. § 21220. Similarly, California's state legislature has found that motorized scooters "produced no emissions, and therefore, do not contribute to increased air pollution or increase traffic congestion… It is the intent of the Legislature in adding this article to promote the use of alternative low-emission or no-emission transportation." CAL. VEH. CODE § 21220. Not only does the California Vehicle Code authorize the use of motorized scooters, but the operating restrictions section states: "The operator of a motorized scooter shall not do any of the following: … (i) Leave a motorized scooter lying on its side on any sidewalk or park a motorized scooter on a sidewalk in any other position, so that there is not an adequate path for pedestrian traffic." *Id*. § 21235(i). Under this provision, parking a dockless scooter on the sidewalk is, therefore, not prohibited. *See Golden Gate Rest. Ass'n v. City & Cnty. of S.F.*, 512 F.3d 1112, 1127 (9th Cir. 2008) ("We are not sure on what basis a court could conclude that the public interest is not served by an ordinance adopted in such a fashion. Perhaps it could so conclude if it were obvious that the Ordinance was unconstitutional or preempted by a duly enacted federal law, in which elected federal officials had balanced the public interest differently…"). Accordingly, the court finds the public interest is not served by granting the preliminary injunction and that this factor weighs against Plaintiffs.

### (d) Balance of Equities

To obtain a preliminary injunction, a plaintiff must also demonstrate that 'the balance of equities tips in his favor." *Hernandez v. Sessions*, 872 F.3d 976, 995 (9th Cir. 2017). Plaintiffs assert that the balance in equities tips in their favor. They take the position that if the injunction is not granted, "people with disabilities who have mobility impairments will be forced to choose between staying in their homes or risking physical safety and mental anguish attempting to navigate the highway obstacle course that public sidewalks have become. If the injunction is entered the only harm may be to the dockless vehicles offerings being present on sidewalks throughout the City." (Doc. No. 106-1 at

18.) Plaintiffs suggest that the City find other ways to display, park and store the dockless vehicles than "private appropriation of the public sidewalks and rights-of-way." (*Id.*)

If the injunction is not entered, Plaintiffs will not, as set forth above, suffer irreparable harm, they will suffer potential inconveniences in the form of dockless vehicles left intermittently on some of the sidewalks and crosswalks they traverse. Although the parties do not specifically address the consequences to the City if the preliminary injunction is granted it seems likely (1) the City will be revoking permits issued to the rental companies and could potentially face lawsuits from the rental companies for the fees associated with the permits and per device fee paid for each dockless vehicles. *See* San Diego Municipal Code § 83.0302; (2) the City would need to end the contract it entered with Sweep; and (3) the City would no longer allow this mode of transportation to be offered to members of the public in violation of legislative policy favoring dockless vehicles. Furthermore, in making their arguments, Plaintiffs ignore the measures the City has already taken to combat the issues the presence of the dockless vehicles has created. Accordingly, the court concludes that the balance of hardships does not tip in Plaintiffs favor.

### (e) Likelihood of Success on the Merits

Plaintiffs argue that the City has failed to fulfill its responsibilities under the ADA and ensure that the sidewalks are maintained to allow meaningful pedestrian access for those with mobility and visual impairments. (Doc. No. 106 at 19-32.) The City counters that Plaintiffs have not met their burden of showing they have a strong likelihood or reasonable certainty that they will prevail on the merits. (Doc. No. 126 at 14-18.)

Likelihood of success is the most important *Winter* factor. *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015); *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014) ("We begin with the first and most important factor: whether petitioners have established a likelihood of success on the merits."). A "district court should deny such relief 'unless the facts and law clearly favor the moving party.'" *Stanley v. Univ. of S. Cal.*, 13 F.3d

1313, 1320 (9th Cir. 1994) (quoting *Anderson v. United States*, 612 F.2d 1112, 1114 (9th Cir. 1979)).

Title II of the ADA prohibits state and local governments from discriminating against persons with disabilities. The relevant statutory language provides: "[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. "Title II emphasizes 'program access' meaning that a public entity's programs and services, viewed in their entirety, must be equally accessible to disabled persons." *Cohen v. City of Culver City*, 754 F.3d 690, 694 (9th Cir. 2014) (citing *Pierce v. Cnty. of Orange*, 526 F.3d 1190, 1215-16, 1222 (9th Cir. 2008)). Similarly, section 504 of the Rehabilitation Act guarantees meaningful access to, "participation in" and the "benefits of" any programs or activities receiving federal financial assistance for qualified individuals. 29 U.S.C. § 794(a). *Alexander v. Choate*, 469 U.S. 287, 301 (1985).

"This prohibition against discrimination is universally understood as a requirement to provide 'meaningful access.'" *Lonberg v. City of Riverside*, 571 F.3d 846, 851 (9th Cir. 2009). "An individual is excluded from participation in or denied the benefits of a public program if 'a public entity's facilities are inaccessible to or unusable by individuals with disabilities.'" *Daubert v. Lindsay Unified Sch. Dist.*, 760 F.3d 982, 987 (9th Cir. 2014) (quoting 28 C.F.R. § 35.149). The regulations implementing Title II of the ADA provide that:

> A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making modifications would fundamentally alter the nature of the services, program, or activity.

28 C.F.R. § 35.130(b)(7) (1993).

Courts have interpreted the scope of Title II to encompass anything a public entity does. *Lee v. City of L.A.,* 250 F.3d 668, 691 (9th Cir. 2001). Indeed, the Ninth Circuit has

held that "maintaining public sidewalks is a normal function of a city and "without a doubt something that the City does" and "maintaining their accessibility for individuals with disabilities therefore falls within the scope of Title II." *Barden v. City of Sacramento,* 292 F.3d 1073, 1076 (9th Cir. 2002)[5]. *See also Frame v. City of Arlington*, 657 F.3d 215, 225-231 (the Fifth Circuit provides an in-depth discussion as to why a sidewalk is unambiguously a service, program or activity of a public entity covered under Title II of the ADA.) In so finding, the *Barden* court noted that "this broad construction of the phrase 'services, programs, or activities' of a local government is supported by the plain language of the Rehabilitation Act, … which defines 'program or activity as 'all of the operations of' a qualifying local government." *Barden,* 292 F.3d. at 1076-77.

Here it is undisputed that Plaintiffs are qualified people with disabilities and are entitled to use the City's sidewalks, crosswalks, transit stops and other walkways. *See Cohen*, 754 F.3d at 700 ("[O]bstructed sidewalks exclude disabled persons from ordinary communal life and force them to risk serious injury to undertake daily activities."). It seems obvious to the court that the primary barrier to maintaining unobstructed sidewalks is the dockless nature of the vehicles, and the level of control the City and the rental companies have over how and where scooter riders leave the scooters after use. What is not obvious, however, is whether the dockless vehicles can be considered architectural barriers of the kind the ADA and its companion state statutes are meant to target.[6]

---

[5] Even if public entities were not subject to applying the feature-specific requirements of the Americans with Disabilities Act Accessibility Guidelines ("ADAAG") to public rights-of-way, then they would "not suddenly find themselves free to ignore access concerns when altering or building new rights-of-way, parks, and playgrounds. The requirements of 28 C.F.R. 35.151 would still apply, holding public entities to the 'readily accessible [] and usable' standard." *Kirola v. City & Cnty. of S.F.*, 860 F.3d 1164, 1180 (9th Cir. 2017).

[6] Assuming the dockless vehicles are architectural barriers, the court is mindful that Title II of the ADA does not require States to fundamentally alter the nature of the services provided, it requires only "reasonable modifications." *Tennessee v. Lane*, 541 U.S. 509, 532 (2004). Indeed, "in no event is the entity required to undertake measures that would

    Moreover, the court is not convinced that Plaintiffs have demonstrated that they will succeed in showing that they have been denied meaningful access to the City's sidewalks when it considers the 5,000 miles of sidewalk the City has to maintain in relation to the number of Plaintiffs' "documented obstructions." Plaintiffs primarily rely on the report submitted by Mr. Jeff Mastin, but the last time Mr. Mastin visited San Diego was in October 2019, and much has changed since then. The court has addressed, *supra*, Plaintiffs' contention that the City's system of sidewalks "comprised a literal obstacle course." (Doc. No. 106-1 at 32, 106-2 at ¶ 62.) The court has also raised its concerns regarding Plaintiffs' expectations and how the City cannot guarantee that individuals with disabilities will not encounter some impediments when they move around on the sidewalks.

    Finally, in addressing their likelihood of success on the merits, Plaintiffs reference the "modest measures the City could have taken include mandating the use of docking stations or expanding the use of corrals for the rental scooters and bikes or requiring dockless companies to take affirmative steps to keep the sidewalks free of obstructions." (Doc. No. 106-1 at 24.) As mentioned above, the City has taken some such steps including contracting with Sweep to immediately impound any dockless vehicle that may be impeding disabled access to public rights-of-way. (*See* Doc. No. 126-2 at ¶12.) In other words, by engaging in this contract, the City's actions could be viewed as taking affirmative steps to maintain the sidewalks and walkways in a condition that is accessible to people with disabilities.

///
///
///

---

impose an undue financial or administrative burden, threaten historic preservation interests, or effect a fundamental alteration in the nature of the service." *Id*. (quoting 28 C.F.R. § 35.150(a)(2),( a)(3)).


On balance, Plaintiffs have failed to demonstrate the law and facts to favor their position or establish a likelihood of their success on the merits.[7]  Accordingly, this favor weighs against Plaintiffs.

## IV.  Conclusion

For the reasons set forth above, the Court **DENIES** Plaintiffs' motion for preliminary injunction. (Doc. No. 106.)

IT IS SO ORDERED.

Dated:  March 19, 2021

_____
Hon. Jeffrey T. Miller
United States District Judge

---

[7] Plaintiffs based the likelihood of success of their California Disabled Person's Act Claim ("CDPA") on the success of their ADA claim.  Having not demonstrated a substantial likelihood of the ADA claim succeeding, the CDPA claim's success has not been adequately demonstrated. (Doc. No. 106-1 at 32.)