1  Robert W. Frank, SBN 95392
2  rfrank@neildymott.com
   Matthew R. Souther, SBN 227910
3  msouther@neildymott.com
   NEIL, DYMOTT, FRANK, McCABE & HUDSON
4  A Professional Law Corporation
   110 West A Street, Suite 1200
5  San Diego, CA 92101
   P 619.238.1712
6  F 619.238.1562

7

8  *[Additional counsel listed on following page]*

9  Attorneys for ALEX MONTOYA, REX SHIRLEY,
   PHILIP PRESSEL, and WYLENE HINKLE
10 On Behalf of the Plaintiff Class

11

12              **UNITED STATES DISTRICT COURT**

13            **SOUTHERN DISTRICT OF CALIFORNIA**

14  ALEX MONTOYA, REX                 )  **CASE NO.: 3:19-cv-00054-JM-BGS**
    SHIRLEY, PHILIP PRESSEL, and      )
15  WYLENE HINKLE, individually,      )  **CLASS ACTION**
    and on behalf of all others similarly )
16  situated,                         )  **MEMORANDUM OF POINTS**
                                      )  **AND AUTHORITIES IN**
17            Plaintiffs,             )  **SUPPORT OF PLAINTIFFS'**
                                      )  **RENEWED MOTION FOR CLASS**
18                                    )  **CERTIFICATION**
    vs.                               )
19                                    )
    CITY OF SAN DIEGO, a public       )  **Date:  August 9, 2021**
20  entity; and DOES 1-100,           )  **Time: 10:00 a.m.**
                                      )  **Judge: Hon. Jeffrey T. Miller**
21            Defendants.             )  **Department: 5D**
                                      )
22                                    )
                                      )  *Complaint Filed:   January 9, 2019*
23                                    )  *Trial Date:         October 18, 2021*
24  _____  )
25

26

27

28

─────────────────────────────────────────────

**Memo. Of Points & Auth. iso Pls' Motion for Renewed Class Certification**
**Case No.: 3:19-cv-00054-JM-BGS**

1

2   Ann E. Menasche, SBN 74774
    Ann.menasche@disabilityrightsca.org
3   DISABILITY RIGHTS CALIFORNIA
    530 B Street, Suite 400
4   San Diego, CA 92101
    Telephone: (619) 239-7861/Fax: (619) 239-7906
5

6   Autumn Elliott, SBN 230043
    Autumn.Elliott@disabilityrightsca.org
7   Ben Conway, SBN 246410
    Ben.conway@disabilityrightsca.org
8   DISABILITY RIGHTS CALIFORNIA
    350 S. Bixel Street, Suite 290
9   Los Angeles, CA 90017
    Telephone: (213) 213-8000/Fax: (213) 213-8001
10
    Aisha C. Novasky
11  Aisha.Novasky@disabilityrightsca.org
    DISABILITY RIGHTS CALIFORNIA
12  3602 Inland Empire Blvd., Suite C110
    Ontario, CA 91764
13  Telephone: (213) 213-8000/Fax: (213) 213-8001

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Memo. Of Points & Auth. iso Pls' Motion for Renewed Class Certification**
**Case No.: 3:19-cv-00054-JM-BGS**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## TABLE OF CONTENTS

I.  INTRODUCTION ...........................................................................................1

II.  FACTS COMMON TO THE CLASS ...................................................................3

    A.  The City's initial inaction created an obstacle course disproportionately burdening people with mobility and/or visual impairments. ....................3

    B.  The City enacted an ineffective shared mobility device (smd) ordinance. 6

    C.  The City's utilization of Sweep, Inc., has likewise been ineffective in opening up sidewalk access to people with visual and mobility disabilities ...........................................................................................7

III.  STATEMENT OF THE CASE ...........................................................................10

IV.  ARGUMENT SUPPORTING CLASS CERTIFICATION ...........................................12

    A.  The Class Is Adequately Defined ............................................................13

    B.  Plaintiffs Satisfy Rule 23(a) Prerequisites ..............................................15

        1.  The proposed class is sufficiently numerous. ...............................15

        2.  Plaintiffs' claims raise issues common to the class.......................17

        3.  Plaintiffs' claims are typical of the class. ....................................19

        4.  Plaintiffs and Counsel Will Adequately Represent Class .............20

    C.  The Requirements of Rule 23 (b)(2) are Satisfied. .................................22

V.  THE COURT SHOULD DESIGNATE PLAINTIFFS' COUNSEL AS CLASS COUNSEL PURSUANT TO RULE 23(G)(1). .........................................24

VI.  CONCLUSION ..............................................................................................25

iii

**Memo. Of Points & Auth. iso Pls' Motion for Renewed Class Certification**
**Case No.: 3:19-cv-00054-JM-BGS**

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

## <u>CASES</u>

4

*Amgen, Inc. v. Conn. Ret. Plans & Trust Funds*,
5
    56 U.S. 455 (2013) ................................................................. 13

6

*Arenas v. San Diego Cnty. Bd. of Supervisors*,
7
    93 Cal. App. 4th 210 (2001) ................................................... 21

8

*Baby Neal for & by Kanter v. Casey*,
9
    43 F.3d 48 (3d Cir. 1994) ....................................................... 23

10

*Bassilios v. Torrance*,
11
    166 F. Supp. 3d 1061 (C.D. Cal. 2015) ................................... 8

12

*Bloom et al. v. City of San Diego*,
    No. 17-CV-2324-AJB-NLS, 2018 WL 9539239 (S.D. Cal. Aug.
13
    21, 2018) ................................................................................ 21

14

*Briseno v. ConAgra Foods, Inc.*,
15
    844 F.3d 1121 (9th Cir. 2017) ............................................... 14

16

*Brown v. D.C.*,
17
    928 F.3d 1070 (D.C. Cir. 2019) ............................................ 22

18

*Burkhalter Travel Agency v. MacFrams Int'l, Inc.*,
19
    141 F.R.D. 144 (N.D. Cal. 1991) .......................................... 13

20

*Californians for Disability Rights, Inc. v. California Dep't of Transp.*,
    249 F.R.D. 334 (N.D. Cal. 2008) ..................................15, 18, 22, 23
21

22

*Campbell v. PricewaterhouseCoopers, LLP*,
    253 F.R.D. 586 ...................................................................... 14

23

*Cohen v. City of Culver City*,
24
    754 F.3d 690 (9th Cir. 2014) ................................................. 12

25

*Comm. to Defend Reproductive Rights v. A Free Pregnancy Ctr.*,
26
    229 Cal. App. 3d 633 (1991) ................................................. 21

27

*Crowder v. Kitagawa*,
28
    81 F.3d 1480 (9th Cir. 1996) .......................................... 1, 13, 14

iv

*DL, et al. v. District of Columbia*,
    860 F.3d 713 ................................................................................22

*Duvall v. Cnty. of Kitsap*,
    260 F.3d 1124 (9th Cir. 2001) ........................................................11

*Ellis v. Costco Wholesale Corp.*,
    657 F.3d 970 (9th Cir. 2011) ..........................................................13

*Fry v. Saenz*,
    98 Cal. App. 4th 256 (2002) ...........................................................21

*Gray v. Golden Gate National Recreational Area*,
    279 F.R.D. 501 (N.D. Cal. 2011) ...................................................18

*Greater Los Angeles Agency on Deafness, Inc. v. Reel Servs. Mgmt.
    LLC*,
    No. CV 13-7172 PSG (ASX), 2014 WL 12561074 (C.D. Cal. May
    6, 2014) ...........................................................................................15

*Hanlon v. Chrysler Corp.*,
    150 F.3d 1011 (9th Cir. 1998) ...................................................19, 20

*Hanon v. Dataproducts Corporation*,
    976 F.2d 497 (9th Cir. 1992) ..........................................................19

*Jordan v. County of Los Angeles*,
    669 F.2d 1311 (9th Cir. 1982), *vacated on other grounds*, 459 U.S.
    810 (1982)........................................................................................15

*Lopez v. San Francisco Unified Sch. Dist.*,
    No. C 99-3260 SI, 2003 WL 26114018 (N.D. Cal. Sept. 8, 2003).............17, 19

*Mark H. v. Lemahieu*,
    513 F.3d 922 (9th Cir. 2008) ..........................................................11

*Mazza v. Am. Honda Motor Co.*,
    666 F.3d 581 (9th Cir. 2012) ..........................................................17

*McGary v. Portland*,
    386 F.3d 1259 (9th Cir. 2004) ........................................................14

*Parsons v. Ryan*,
    754 F.3d 657 (9th Cir. 2014) ..........................................................17

*Paxton v. Union Nat'l Bank*,
   688 F.2d 552 (8th Cir. 1982) ........................................................... 15

*Pierce vs. County of Orange*, 526 F. 3d 1190 (9th Cir. 2008) ................................. 14

*Probe v. State Teachers' Ret. Sys.*,
   780 F. 2d 776 (9th Cir. 1986) ........................................................... 14

*Rodde v. Bonta*,
   357 F.3d 988 (9th Cir. 2004) ........................................................... 14

*Rodriguez v. Hayes*,
   591 F.3d 1105 (9th Cir. 2010) ......................................................... 19

*Romero v. Producers Dairy Foods, Inc.*,
   235 F.R.D. 474 (E.D. Cal. 2006) .................................................... 15

*Sueoka v. United States*,
   101 F. App'x 649 (9th Cir. 2004) .................................................... 15

*Tobe v. City of Santa Ana*,
   9 Cal. 4th 1069 (1995) ..................................................................... 12

*Torres v. Mercer Canyons Inc.*,
   835 F. 3d 1125 (9th Cir. 2016) ....................................................... 14

*Wal-Mart Stores, Inc. v. Dukes*,
   564 U.S. 338 (2011) ........................................................... 17, 18, 22

*Weinreich v. Los Angeles Cnty. Metro. Transp. Auth.*,
   114 F.3d 976 (9th Cir. 1997) ........................................................... 11

## **STATUTES**

29 U.S.C. § 794(a) ................................................................................. 10

42 U.S.C. § 12132 ................................................................................. 11

California Civil Code § 52(f) ................................................................ 11

California Civil Code § 54(c) ................................................................ 11

San Diego Municipal Code § 83.0310 ................................................. 6

San Diego Municipal Code § 83.0311 ................................................. 8

**Memo. Of Points & Auth. iso Pls' Motion for Renewed Class Certification**
**Case No.: 3:19-cv-00054-JM-BGS**

San Diego Municipal Ordinance O-21070 ................................................................ 6

**RULES & REGULATIONS**

Federal Rule of Civil Procedure 23 ....................................................... 12, 13, 14

Federal Rule of Civil Procedure 23(a) ......................................................... 12, 14

Federal Rule of Civil Procedure 23(a)(1) ..................................................... 14, 15

Federal Rule of Civil Procedure 23(a)(3) .......................................................... 19

Federal Rule of Civil Procedure 23(a)(4) ..................................................... 20, 21

Federal Rule of Civil Procedure 23(b) .............................................................. 12

Federal Rule of Civil Procedure 23(b)(2) .............................................. 2, 12, 22, 23

Federal Rule of Civil Procedure 23 (b)(3) ........................................................ 14

Federal Rule of Civil Procedure 23(c)(1)(B) ..................................................... 24

Federal Rule of Civil Procedure 23(g) .............................................................. 12

Federal Rule of Civil Procedure 23(G)(1) ........................................................ 24

Federal Rule of Civil Procedure 23(g)(1)(A)(i)-(iv) ............................................ 24

**OTHER AUTHORITIES**

5 Moore's Federal Practice § 23.22[3][b] (3d ed. 2003) ........................................ 15

Memo. Of Points & Auth. iso Pls' Motion for Renewed Class Certification
Case No.: 3:19-cv-00054-JM-BGS

## I.      INTRODUCTION

Plaintiffs have thoroughly reviewed the Court's Order on Plaintiffs' Motion for Class Certification (Doc. No. 147) and have made significant changes to their proposed class definition in response. Specifically, Plaintiffs have:

- dropped the request for statutory damages on behalf of the class;
- narrowed the geographic scope;
- specified a time period;
- struck terms found to be overly "open-ended" by the Court; and
- more precisely described the class.

Plaintiffs have also supplied additional evidence of numerosity in support of certification of the class. Because these changes fully respond to the issues raised in the Court's Order and provide a "more defined class" (Order at 9), Plaintiffs' Renewed Motion for Class Certification should be granted.

As San Diego opens up with the loosening of COVID-19 restrictions, dockless vehicles are once again proliferating and causing frequent obstructions on the sidewalks, crosswalks, curb ramps and transit stops of the City, especially in highly popular areas of central San Diego. While the scooters blocking San Diego's walkways may pose no more than an inconvenience or a nuisance to many of its residents and visitors without disabilities, for people with mobility and visual disabilities, the burden caused by dockless vehicles is qualitatively more severe. For people with such disabilities, it is far more difficult to circumvent, avoid, or remove these obstacles without incurring a high risk of injury or being forced to depend on someone else to assist them. This burden, which is *different and greater* than people without disabilities face, pervasively interferes with disabled access, and continues to do so. *See Crowder v. Kitagawa*, 81 F.3d 1480, 1484 (9th Cir. 1996) (holding that, where a government practice burdens people with disabilities "in a manner different and greater than it burdens others," the government has denied them meaningful access in violation of the ADA).

The City can take simple, low-cost, and reasonable measures to maintain the accessibility of its public walkways in the central areas of the City for people with mobility and visual disabilities, while at the same time accommodating the existence of scooters there for rent. The few steps the City has taken in response to the rampant use of sidewalks for scooter driving and storage – its 2019 Shared Mobility Device Ordinance, the establishment of a number of corrals in a few neighborhoods, and the hiring of Sweep – have been largely ineffective at removing these frequent barriers to disabled access. People with disabilities need an equal opportunity to use the public sidewalks as compared their non-disabled neighbors. Indeed, the ADA requires no less.

Named Plaintiffs hereby renew their Motion for Class Certification under Federal Rule of Civil Procedure 23(b)(2), substituting a new and substantially narrower class definition for the previous one:

> **Persons with visual and/or mobility disabilities residing in the City of San Diego, who on or after January 1, 2018 have used the pedestrian rights-of-way located in the Central Areas of the City and whose access, due to their disabilities, is allegedly negatively impacted by the City's challenged policies and practices regarding the presence of dockless vehicles on these pedestrian rights-of-way.**
>
> ***"Persons with mobility disabilities"*** are those who have disabilities affecting mobility as recognized by the ADA and who use wheelchairs, scooters, crutches, walkers, canes, and/or similar devices for navigation due to their disabilities or have prosthetic limbs or other medical conditions that make walking, and safely and independently avoiding, removing, or circumventing obstacles on sidewalks more difficult than for persons without disabilities.
>
> ***"Persons with visual disabilities"*** are those who have disabilities affecting vision as recognized by the ADA and use canes or services animals for navigation due to their disabilities, and whose disabilities make safely and independently identifying, avoiding, removing or circumventing obstacles on sidewalks more difficult than for persons without disabilities.
>
> ***"Central Areas of the City of San Diego"*** consist of these ten major communities in the City of San Diego and all of the sub-communities

within them: (1) Downtown; (2) Greater Golden Hill; (3) North Park; (4) Uptown; (5) Balboa Park; (6) Pacific Beach; (7) Mission Beach; (8) Mission Bay Park; (9) Ocean Beach; (10) Old Town San Diego.[1] *"Pedestrian rights-of-way"* consist of sidewalks, crosswalks, curb ramps, and transit stops under the jurisdiction of the City of San Diego located in Central Areas of San Diego.

In addition to Plaintiffs' re-crafted class definition, Plaintiffs are no longer seeking statutory damages for the class but are pursuing solely injunctive and declaratory relief as a class-wide remedy. This modification of Plaintiffs' class claims changes the standard for establishing numerosity and obviates the need to identify individual class members. Plaintiffs are also producing additional, more robust evidence in support of numerosity.

This case is well-suited for class certification. It meets all of the requisites of Fed. R. Civil. Proc. 23(a) and (b)(2) for addressing through a common remedy San Diego's policies and practices that have allowed dockless vehicles to pervasively obstruct pedestrian rights-of-way and to impose disproportionate burdens on people with mobility and visual disabilities. Having fully responded to each of the concerns raised by the Court in denying without prejudice Plaintiffs' earlier motion for Class Certification, (ECF No. 147) Plaintiffs' Renewed Motion for Class Certification should therefore be granted.

## II.   FACTS COMMON TO THE CLASS

### A.   The City's initial inaction created an obstacle course disproportionately burdening people with mobility and/or visual impairments.

When dockless vehicles arrived to San Diego *en masse*, the City did nothing to regulate them, creating a "literal obstacle course" for people with disabilities on the pedestrian walkways. *See* ECF No. 106-2 ("Mastin Decl."), ¶ 62. The City's own accessibility expert, Paul A. Joelson, describes the situation during this period

---

[1] *See* Request for Judicial Notice filed herewith.

(from the scooters' arrival in January of 2018 through the adoption of the City's Shared Mobility Device (SMD) ordinance on May 17, 2019) as "chaos." Declaration of Ann Menasche ("Menasche Decl."), Ex. N., p. 2.  He reports that the confusion resulted in "vehicles stowed individually or in clusters blocking access over public sidewalks or curb ramps" and that "these conditions conflicted with Title II of the ADA…" *Id.*

Plaintiffs' accessibility expert, Jeff Mastin, elaborates:

> I observed the ubiquitous presence of numerous parked dockless vehicles in all areas of the pedestrian sidewalk throughway. A pedestrian with a disability who is blind or mobility impaired traveling along such a sidewalk would be forced to constantly dodge these vehicles. Often the parked dockless vehicles obstructed the accessible curb ramp, preventing even the ability to dodge them for persons who require an accessible route.

ECF No. 106-2, Mastin Decl., ¶ 62. Further, according to Mr. Mastin, "…unoccupied dockless vehicles pervasively obstruct required accessible elements of the sidewalks and walkways of the City." *Id.* at ¶ 61. It is therefore undisputed that prior to the SMD Ordinance, the scooter obstructions were ubiquitous.

The "chaos" of these scooter obstructions, while presenting an inconvenience for people without disabilities, has a different and greater effect on blind individuals and on people who use mobility aids or have comparable medical conditions. For example, a person whose disability requires that they use a wheelchair may be unable to get to a curb ramp if a scooter is blocking it, while a person without disabilities who does not need a curb ramp could easily circumvent this obstacle. Similarly, a person who is blind and uses a probing cane may be unaware of a scooter jutting into the path of travel, resulting in injury; or, if a scooter is blocking the signal box, may be unable to safely cross the street.  In contrast, a person who is not blind could move the scooter out of the way or see the ongoing traffic and safely cross the street. Likewise, a scooter blocking a bus stop

4

might prevent a disabled person from using a lift to exit the bus, while a person without disabilities would have no difficulty leaving the bus.

The named plaintiffs have repeatedly encountered just such problems. Wylene Hinkle, who is blind and has a mobility disability, states that since 2018, dockless scooters and bikes "have greatly interfered with my ability to safely and enjoyably walk and take the bus in the City." *See* Hinkle Decl., ¶ 4. She explains: "I have been forced to walk into the streets to get around scooters blocking my path, which is particularly frightening because I cannot see." *Id*. She has also encountered scooters blocking audio signal boxes, curb cuts, and bus stops. *Id*. at ¶ 5.  She has been physically struck by dockless vehicles on multiple occasions. *Id.*; *see also* Montoya Decl., ¶ 5 ("I used to walk outside almost every single day, and when doing so, I found myself dodging dockless vehicles on sidewalks and street crossings, coming from all directions at rapid rates of speed without warning."); Pressel Decl., ¶ 9 ("Other times, the dockless vehicles are left in the middle of the sidewalk and I either almost hit them, risking damage to my mobility scooter and myself, or I am forced to backtrack and take an alternative route."); Shirley Decl., ¶ 9 ("I go out of my home less often because of these issues with dockless electric vehicles, and when I do go out, I find my travel impeded by dockless vehicles in a way that I cannot avoid or go around due to my disabilities.").

In recent months, the scooters have continued to negatively affect Plaintiffs' access. *See* Hinkle Renewal Declaration in Support of Renewed Motion, ("Renewed Hinkle Decl.") ¶ 6 ("In March of 2021, in San Diego's Downtown area, my cane was struck and broken by a moving scooter."), ¶ 7, ("On June 23rd, 2021, I was waiting at the bus stop on 4th and University and the area between the bus and the bench was blocked by a pile of scooters. I didn't try to move the scooters because, with my visual and mobility impairments, this would have been a difficult task.").

In short, the City's policy of allowing the presence of scooters on sidewalks

1  places a different and greater burden on people with mobility and visual
2  disabilities.

3      **B.    The City enacted an ineffective shared mobility device (smd)**
4          **ordinance.**

5          On May 17, 2019, the City adopted the City of San Diego Municipal
6  Ordinance O-21070. *See* ECF No. 77, 77-1. The City's ordinance, ostensibly
7  aimed at limiting the impact of dockless vehicles, *actually allows* those vehicles to
8  be staged and parked on sidewalks in most areas of the central city with the
9  exception of the "downtown community plan area." S.D. Mun. Code § 83.0310;
10 *see* Menasche Decl., ¶ 4; Ex. A. In the "beach impact area" the ordinance
11 authorizes the presence of dockless vehicles on sidewalks in groups of up to four.
12 *Id.*

13         While the Ordinance prohibits dockless vehicles from being displayed or
14 parked on sidewalks in the "downtown community plan area," it explicitly permits
15 them in *every* other area of the City, including the rest of the central city. In fact,
16 the City encourages such barriers. The City's own "Shared Mobility Device
17 (SMD) Parking and Staging Guidelines" includes a photograph of dockless
18 scooters blocking a sidewalk, and answers the question "Is this OK?" with "Yes."
19 Menasche Decl., ¶ 4; Ex. A at COSD-20023. Thus, it is entirely predictable that
20 despite the ordinance, dockless vehicles on sidewalks continue to proliferate and
21 regularly obstruct pedestrian rights of way throughout the central areas of the City.
22 And that is exactly what happened. *See, e.g.*, Mastin Decl., ¶ 85 (finding that the
23 City's SMD Ordinance contributes to the obstruction problem by allowing up to
24 four vehicles to be parked on the sidewalk in the "Beach Impact Area").[2]

25

26 [2] Indeed, during Mr. Mastin's second inspection, several months after the
27 ordinance was implemented, he found "only a marginal improvement" in
   conditions as compared to conditions observed during his first inspection prior to
28 the passage of the ordinance. ECF No. 106-2, Mastin Decl., ¶ 56. As Mr. Mastin

**Memo. Of Points & Auth. iso Pls' Motion for Renewed Class Certification**
**Case No.: 3:19-cv-00054-JM-BGS**

1       This is also consistent with the ongoing experience of people with

2   disabilities whose access has been and continues to be negatively affected by the

3   scooters and of other observers in San Diego. *See, e.g.*, Declaration of Ali Faraj

4   ("Faraj Decl."), ¶ 6; Declaration of Jonathan Freeman ("Freeman Decl."), ¶¶ 4, 6-

5   8; Ex. A-M). *See also* Renewed Hinkle Decl.; Declaration of Ali Faraj in support

6   of Renewed Motion for Class Certification ("Renewed Faraj Decl."); Declaration

7   of DeeVee Lange ("Lange Decl."); Declaration of Helen Rowe Allen ("Allen

8   Decl."); Declaration of Marcia Liss ("Liss Decl."); Declaration of Leticia Zuno

9   ("Zuno Decl.").

10       **C.**    **The City's utilization of Sweep, Inc., has likewise been ineffective**

11           **in opening up sidewalk access to people with visual and mobility**

12           **disabilities.**

13       The City ostensibly addresses problems created by stray scooters on

14   sidewalks that disproportionately burden people with mobility and visual

15   disabilities by tracking complaints through its "Get It Done" application and by

16   contracting with a private company for scooter removal.  At the same time, despite

17   the volume of scooter complaints involving blocked curb cut ramps and other

18   interference with accessible paths of travel, the City does nothing to track disability

19   nor to coordinate resolution of complaints with the ADA office.[3]

20   _____

21   noted: "I observed many unoccupied dockless vehicles obstructing accessible
elements that were apparently placed there by users or the positions were modified

22   by passers-by…Users are not expected to be educated on the nature, extent and
maintenance of accessible elements. As a result, they can be parked anywhere,

23   even if it negatively impacts accessibility of the public right-of-way system." *Id.* at

24   ¶ 74.

25   [3] The "shared mobility device" section of Get it Done does not request whether the
complaint is related to disability. Menasche Decl., ¶ 7; Ex. D. In contrast, such a

26   request regarding disability is included in the form for a complaint that involves

27   sidewalk repair. *Id.* at ¶ 8; Ex. E; Ex. C ("Ellsworth Depo."), 54:8-10. Indeed, the
person in charge of "Get It Done" complaints does not work with the City's ADA

28   Coordinator, Thyme Curtis, of the Office of ADA Compliance and Accessibility,

7

**Memo. Of Points & Auth. iso Pls' Motion for Renewed Class Certification
Case No.: 3:19-cv-00054-JM-BGS**

The City hired Sweep, Inc. in January of 2020 to carry out dockless vehicle removal. *See* Menasche Decl., ¶ 12; Ex. H, COSD-0153-0155, 0163-0166. However, the City has provided Sweep, Inc. with neither the resources nor the authority it needs to remove in a timely manner scooters blocking sidewalk and curb cut access ramps or blocking accessible walkways.

First, Sweep only operates during limited hours, while scooter rentals are available for rent any time of the day and night. According to Sweep CEO Rich Branning, Sweep currently works from 8:00 a.m. to 2:00 p.m. Menasche Decl., Ex. O, ("Branning Depo."),  136:16-19. But – like everyone else – people with disabilities use public sidewalks after two o'clock to run errands, attend appointments, and commute home from work. *See Bassilios v. Torrance*, 166 F. Supp. 3d 1061, 1078 (C.D. Cal. 2015) (holding that a municipality that provided parking access to a woman with a disability only during limited hours had failed to provide meaningful access because "[n]on-disabled persons are not subject to similar constraints and inconvenience.").

In addition, Sweep is prohibited by the City from removing errant scooters unless it first gives three-hour notice except where the scooter is an "imminent life safety hazard." S.D. Mun. Code § 83.0311. In fact, the City has specifically instructed Sweep that it must give three-hour notice to the scooter companies prior to removing scooters even from ADA access ramps.[4] Branning Depo., 137:1 –

---

nor does that ADA office review the many hundreds of dockless vehicle complaints submitted through the "Get It Done" app. *Id.* at Ex. C ("Ellsworth Depo."), 55:4-7; Ex. B ("Curtis Depo."), 31:14-23. City practice has thus effectively isolated and removed the City's ADA office from being able to effectively address the disabled access problems posed by the proliferation of dockless vehicles on the City's sidewalks.

[4] During the first three months of Sweep's contract, Sweep was authorized to immediately remove scooters from ADA access ramps. Branning Depo., 51:21 – 55:5.  In February 2020, Sweep was instructed to no longer do so. *Id.* At no time

137:12, 148:24 – 149:12; *see also* Menasche Decl., Ex. P. This means that, in light of Sweep's current work schedule, if for example a scooter blocking a curb cut ramp (which are necessary for a person in a wheelchair to get through) is reported at 11:00 a.m. the scooter could end up being there overnight. Branning Depo., 143:7 – 147:25.

Sweep personnel have acknowledged the untenable situation on the City's sidewalks due to the ubiquitous presence of dockless vehicles and the lack of adequate resources to address the problem. Johnny MacArthur, an employee of Sweep, described the situation in May of 2020 (during last summer's re-opening) as a "mess" that he feared would get worse. Menasche Decl., Ex. Q. "There are Spins, Lyfts and Birds parked on sidewalks… blocking ADAs, etc. It is too much for one person to effectively make a dent." *Id.*

Despite this continued "mess," the City has never taken corrective action against the scooter companies for failing to take reasonable steps to prevent their equipment from impeding disabled access on this City's sidewalks. The City has never placed limits on the number of scooters that can be permitted, never denied or revoked any permits, never limited the number of scooters that can operate within geographic areas, and never verified the number of scooters an operator deployed, or other information during the permitting process. Menasche Decl., ¶ 10; Ex. G ("Torres Depo."), 24:6-15, 79:3-6, 82:23-24, 78:3-9, 83:14 - 84:14, 81:3-7.

The only effective measures were not taken by the City at all – they were the temporary impact of the COVID-19 pandemic on ridership and the dockless vehicle providers' own actions in removing their equipment from the City in

_____

did the City authorize immediate removal of scooters parked in the middle of the sidewalk. Branning Depo., 65:16 – 21, 66:7-16, 71:5-16. Currently and through most of its contract, Sweep is "not permitted to touch scooters on sidewalks." *See* Menasche Decl., Ex. P.

**Memo. Of Points & Auth. iso Pls' Motion for Renewed Class Certification
Case No.: 3:19-cv-00054-JM-BGS**

response to the pandemic. The City's complaint application, "Get it Done" began tracking complaints regarding dockless vehicles in June 2019. Menasche Decl., ¶ 6; Ex. C ("Ellsworth Depo.") 53:21-22. During the week of July 12-18, 2019, 185 individuals logged 1,169 separate complaints. *Id.* at Ex. C, 56:18-21. Complaints were drastically reduced coincident with the lockdowns related to the COVID-19 pandemic, but have expanded during each period in which restrictions were reduced or lifted, including the summer of 2020 and the current time. For example, during the week of August 21-27, 2020, 43 individuals logged 46 complaints. *Id.* And during the week of June 27, 2021 through July 4, 2021, individuals logged a whopping 1002 separate complaints, virtually back up to the pre-pandemic level. Menasche Decl., Ex. S. This comports with Class Members' experiences. *See* Freeman Decl.; Faraj Decl. But people with disabilities cannot rely on new waves of COVID-19 infection or on future pandemics to ensure their access to the City's sidewalks – they need the City to take appropriate action to maintain the accessibility of these public paths of travel.

 The City's policies and practices enable ongoing denial of access. The City's policies condone, normalize, and facilitate the placement and storage of scooters on sidewalks and its practices allow scooters to proliferate on the walkways in the central areas of the City. These actions prioritize the bottom lines of private for-profit scooter companies – whose equipment does not *need* to be on public sidewalks in order to serve its transportation purpose – over the civil rights of the City's disabled residents.

## III.  <u>STATEMENT OF THE CASE</u>

 Section 504 of the Rehabilitation Act provides, in relevant part: "No otherwise qualified individual with a disability … shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance…" 29 U.S.C. § 794(a). Similarly, Title II of the ADA provides

10

that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.[5]

To prove a violation of Title II of the ADA, Plaintiffs must show: (1) they are qualified individuals with a disability; (2) they were "either excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or [were] otherwise discriminated against by the public entity[;]" and, (3) "such exclusion, denial of benefits, or discrimination was by reason of their disability. *See Weinreich v. Los Angeles Cnty. Metro. Transp. Auth.*, 114 F.3d 976, 978 (9th Cir. 1997) (emphasis removed). Similarly, to establish a prima facie Section 504 claim, Plaintiffs must establish that: (1) they are individuals with a disability; (2) they are otherwise qualified to receive the benefit; (3) they were "denied the benefits of the program solely by reason of their disability; and, (4) "the program receives federal financial assistance." *See Duvall v. Cnty. of Kitsap*, 260 F.3d 1124, 1135 (9th Cir. 2001), *amended by* denial of reh'g, (citing *Weinreich,* 114 F.3d at 978). "[T]he focus of the prohibition in § 504 is 'whether disabled persons were denied meaningful access to state-provided services.'" *See Mark H. v. Lemahieu*, 513 F.3d. 922, 937 (9th Cir. 2008) (quoting *Crowder v. Kitagawa*, 81 F.3d 1480, 1484).

Sidewalks are services, programs, and activities of the City under the ADA. The City has failed to maintain those sidewalks free of pervasive obstructions so that people with disabilities have equal, meaningful access to and enjoyment of the sidewalks in the central areas of San Diego. The City's ADA Coordinator

---

[5] The ADA is incorporated into California law – the Unruh Act and the Disabled Persons Act – and establishes a floor of protection.  Therefore, under these Acts, liability may be found on the same basis as under the ADA. *See* CA Civil Code §§ 52(f), 54(c).

**Memo. Of Points & Auth. iso Pls' Motion for Renewed Class Certification
Case No.: 3:19-cv-00054-JM-BGS**

describes a "safe walkable neighborhood" as one where "you can get around a neighborhood safely, [with] no barriers existing for people with disabilities. They would be able to go to the same places as somebody without a disability." *See* Menasche Decl., Ex. B ("Curtis Depo."), 30:3-11. However, the City is very far from achieving this goal. "[A] city not only has the power to keep its streets and other public property open and available for the purpose to which they are dedicated but has a duty to do so." *See Tobe v. City of Santa Ana*, 9 Cal. 4th 1069 (1995). Indeed, "[o]bstructed sidewalks exclude disabled persons from ordinary communal life and force them to risk serious injury to undertake daily activities. This is precisely the sort of 'subtle' discrimination stemming from 'thoughtlessness and indifference' that the ADA aims to abolish." *Cohen v. City of Culver City*, 754 F.3d 690, 700 (9th Cir. 2014) (reversing summary judgment where vendors blocked access to a curb ramp and, "a jury could conclude that the City discriminated … by reason of … disability by failing to take simple, low-cost, reasonable measures to accommodate persons who rely on curb ramps to navigate public sidewalks.").

Accordingly, Plaintiffs filed an initial Complaint on January 9, 2019, and a First Amended Complaint (FAC) on March 21, 2019. *See* ECF No. 1; ECF No. 14. Plaintiffs filed a Motion for Class Certification on January 29, 2021 (ECF No. 135) which this Court denied without prejudice on June 9, 2021. *See* ECF No. 147. The Court authorized Plaintiffs to file a renewed motion for class certification with a more defined class within thirty days of entry of the Order. *Id.*

## IV.   ARGUMENT SUPPORTING CLASS CERTIFICATION

A proposed class should be certified if it meets (1) the four threshold requirements of Rule 23(a) (numerosity, commonality, typicality, and adequacy); (2) at least one of the provisions of Rule 23(b); and (3) Rule 23(g) governing appointment of class counsel. *See* Fed. R. Civ. P. 23. As discussed below, the

proposed class meets all of the Rule 23(a) requirements, the requirements of Rule 23(b)(2), as well as Rule 23(g).

"Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage." *Amgen, Inc. v. Conn. Ret. Plans & Trust Funds*, 56 U.S. 455, 466 (2013); *see also Burkhalter Travel Agency v. MacFrams Int'l, Inc*., 141 F.R.D. 144, 152 (N.D. Cal. 1991). Rather, in deciding motions for class certification, the court "examine[s] the merits of the underlying claim . . . only in as much as it must determine whether common questions exist; not to determine whether class members could actually prevail on the merits of their claims." *See Ellis v. Costco Wholesale Corp*., 657 F.3d 970, 983 n.8 (9th Cir. 2011); *see also Amgen, Inc. v. Conn. Ret. Plans & Trust Funds*, at 466.

## A.   The Class Is Adequately Defined.

Plaintiffs' revised class definition is clear, precise, and objective. The class covers San Diego residents with visual and/or mobility disabilities who utilize the public walkways and who allege that their access has been negatively impacted due to their disabilities by City policies and practices regarding the presence of scooters on pedestrian rights-of-way. The class definition has been narrowed to only cover the central areas of the City where dockless vehicles are most concentrated, specifies a time period, and no longer includes a claim for statutory damages for the class.   Persons with visual and/or mobility disabilities residing in the City of San Diego are precisely defined to consist of people whose disabilities require the use of assistive devices to ambulate (or have prosthetics or other medical conditions making it difficult to walk) and that make it more difficult to safely and independently identify, avoid, remove or circumvent obstacles on the City's pedestrian rights-of-way as compared to persons without disabilities. The definition itself therefore differentiates between the nuisance to all members of the public caused by obstructively staged or parked scooters on public pedestrian rights-of-way and the *different and greater burden* imposed on people with

13

mobility and visual disabilities. *See Crowder v. Kitagawa*, 81 F.3d at 1484 (holding that, where a government practice burdens people with disabilities "in a manner different and greater than it burdens others," the government has denied them meaningful access in violation of the ADA); *see also McGary v. Portland*, 386 F.3d 1259, 1265 (9th Cir. 2004) and *Rodde v. Bonta,* 357 F.3d 988, 998 (9th Cir. 2004) (applying the standard articulated in *Crowder* to evaluate claims of disability discrimination). The current class definition, especially for a 23(b)(2) class that no longer contains a statutory damage claim, is "sufficiently definite to conform to Rule 23." *Probe v. State Teachers' Ret. Sys.*, 780 F. 2d 776, 780 (9th Cir. 1986).

No separate "ascertainability" or administrative feasibility element is required. "[T]he language of Rule 23 neither provides nor implies that demonstrating an administratively feasible way to identify class members is a prerequisite to class certification." *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1133 (9th Cir. 2017). Moreover, the need to identify class members with particularity is obviated where, as here, the class seeks injunctive and declaratory relief *only* and there is no monetary relief claim of any kind, even an incidental one. The concern about a definition that is "overbroad" or "vague," and that may contain members who were not injured, is one tied to cases containing damage claims. *See, e.g., Probe v. State Teachers' Ret. Sys.*, 780 F. 2d at 776 (seeking retroactive monetary relief under Title VII); *Torres v. Mercer Canyons Inc.*, 835 F. 3d 1125 (9th Cir. 2016) (farmworkers seeking damages in a Rule 23 (b)(3) class for wage underpayment); *Campbell v. PricewaterhouseCoopers, LLP*, 253 F.R.D. 586 (a wage and hour case seeking back pay under 23(b)(3) class; *Pierce vs. County of Orange*, 526 F. 3d 1190 (9th Cir. 2008) (pre-trial detainees seeking damages in a Rule 23(b)(3) class).

**B.   Plaintiffs Satisfy Rule 23(a) Prerequisites**

**1.   The proposed class is sufficiently numerous.**

To certify a proposed class, it must be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). A "court may make common sense assumptions to support a finding that joinder would be impracticable." 1 Newberg on Class Actions, § 3:3 ("Where the exact size of the class is unknown but general knowledge and common sense indicate that it is large, the numerosity requirement is satisfied."); *see also Californians for Disability Rights, Inc. v. California Dep't of Transp*., 249 F.R.D. 334, 347 (N.D. Cal. 2008) (holding that a combination of census data and common sense suffice for demonstrating numerosity.).

Moreover, the numerosity requirement contained in Fed. R. Civ. P. 23(a)(1) is significantly "relaxed" in cases such as this one seeking only injunctive or declaratory relief, so "even speculative or conclusory allegations regarding numerosity are sufficient to permit class certification." *Sueoka v. United States*, 101 F. App'x 649, 653 (9th Cir. 2004) (quoting 5 Moore's Federal Practice § 23.22[3][b] (3d ed. 2003)); *see also Greater Los Angeles Agency on Deafness, Inc. v. Reel Servs. Mgmt. LLC*, No. CV 13-7172 PSG (ASX), 2014 WL 12561074 at *8 (C.D. Cal. May 6, 2014) ("the requirements of numerosity often 'relax' when only injunctive or declaratory relief is sought").

In determining the impracticability of joinder under Rule 23(a)(1), the court may also consider other factors besides the sheer size of the class. *See Jordan v. County of Los Angeles*, 669 F.2d 1311, 1319 (9th Cir. 1982), *vacated on other grounds*, 459 U.S. 810 (1982); *Paxton v. Union Nat'l Bank*, 688 F.2d 552, 559-60 (8th Cir. 1982). One such factor is the "relatively small size of each class member's claim." *Jordan*, 669 F.2d at 1319. Another factor is the impracticability of joinder when injunctive or declaratory relief is sought. *Id.* Here, the only relief sought is injunctive and declaratory so joinder would be highly impractical.

15

**Memo. Of Points & Auth. iso Pls' Motion for Renewed Class Certification
Case No.: 3:19-cv-00054-JM-BGS**

As a general rule, classes of 40 or more suffice to establish numerosity. *See* J. Moore's Fed. Prac.- Civil § 23.22[1][b]; *see also Romero v. Producers Dairy Foods, Inc.*, 235 F.R.D. 474, 485 (E.D. Cal. 2006) ("A class with over forty members is presumed to satisfy the numerosity prerequisite.").

With this Renewed Class Certification Motion, Plaintiffs provide additional evidence establishing that this standard is met here: (1) an on-line petition to San Diego Mayor Todd Gloria protesting scooters on San Diego's walkways that quickly received 110 unduplicated signatures of people identifying themselves as people with disabilities affected by the scooters' presence (Declaration of Jonathan Freeman in support of Renewed Motion for Class Certification); (2) a Declaration by Leticia Zuno, Executive Director of Access to Independence, Inc., a San Diego based independent living organization for people with disabilities, who declares that she has personally received complaints from "from many dozens of consumers with mobility or visual impairments as well as fellow members of staff" " about the presence of dockless vehicles on the City's walkways interfering with their access (Zuno Decl., ¶¶ 3-4); three additional declarations from putative class members regarding their personal experiencing with the dockless vehicles blocking access (Lange Decl., Allen Decl., and Liss Decl.).

This new evidence, combined with Census records showing approximately 53,863 San Diegans have visual disabilities and 162,730 have ambulatory disabilities (Menasche Decl., Ex. L.) and declarations of named Plaintiffs and putative Class Members previously filed, confirms the reasonableness of Plaintiffs' previous estimate that the Class is comprised of a minimum of several hundred to many thousands of persons. In any case, the number is certainly greater than 40.

In addition, as the City opens up with statewide COVID-19 restrictions lifted, the numbers of scooter complaints logged into the City's "Get It Done" app has mushroomed. *See* discussion *infra* p. 10. To assume that none or merely a handful of these complaints involve people with disabilities presumes that people

16

1  with disabilities do not have normal lives — do not shop, travel to work, visit the

2  park, attend medical appointments, go to the beach, etc. — and that is simply

3  untenable.

4    Given the ubiquitous nature of the dockless vehicles on the public

5  walkways, the large number of people with mobility and visual disabilities residing

6  in the City (who as society opens up are unlikely to stay shut in their houses and

7  will instead along with the rest of us participate in the many amenities of living in

8  San Diego), as well as the additional evidence Plaintiffs have filed with their

9  renewed Motion, Plaintiffs have met this requirement.

10       **2. Plaintiffs' claims raise issues common to the class.**

11    Commonality requires that class members share a common claim that is

12  "capable of class-wide resolution," meaning that determination of the claims'

13  "truth or falsity will resolve an issue that is central to [the claims'] validity . . . in

14  one stroke." *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) ("*Dukes*

15  *II*"). Commonality is a "limited burden": there need be only one common question.

16  *Mazza v. Am. Honda Motor Co*., 666 F.3d 581, 589 (9th Cir. 2012). "Where the

17  circumstances of each particular class member vary, but retain a common core of

18  factual or legal issues with the rest of the class, commonality exists." *Parsons v.*

19  *Ryan*, 754 F.3d 657, 675 (9th Cir. 2014) (alteration in original). "What matters to

20  class certification … [is] the capacity of a class-wide proceeding to generate

21  common answers apt to drive the resolution of the litigation." *Dukes II*, 564 U.S. at

22  350 (quotation marks and citation omitted).

23    The overarching question in this case is, "Do the City's policies and

24  practices regarding dockless vehicles result in barriers to accessible pedestrian

25  rights-of-way for persons with visual and mobility disabilities?" All Named

26  Plaintiffs are persons with visual and/or mobility impairments, as is everyone in

27  the proposed class. "In cases brought under the ADA and section 504 where the

28  allegations in the complaint stem from allegedly exclusionary policies and barriers,

17

**Memo. Of Points & Auth. iso Pls' Motion for Renewed Class Certification
Case No.: 3:19-cv-00054-JM-BGS**

these barriers provide a common nucleus of operative fact from which to seek injunctive relief." *See Lopez v. San Francisco Unified Sch. Dist*., No. C 99-3260 SI, 2003 WL 26114018, at *3 (N.D. Cal. Sept. 8, 2003).

As laid out in Section II above, the City's policies and practices allowing and even encouraging dockless vehicles to proliferate on the City's sidewalks are uniform. The City's policies and practices are laid out through its SMD Ordinance and centralized complaint and enforcement mechanisms. The City has failed to actively and in an effective and coordinated fashion remedy the issue. This means that all proposed Class Members are being exposed to the same results of the City's action and inaction – a burden on their access to public rights-of-way that is different from and greater than that enjoyed by people without disabilities. The issue of whether or not equal access and enjoyment is available to Class Members will resolve a common issue central to all claims "in one stroke." *Dukes II,* 564 U.S. at 350.

The district court's decision in *Californians for Disability Rights, Inc. v. California Department of Transportation*, 249 F.R.D. 334 (N.D. Cal. 2008), is illustrative. *Disability Rights* certified a *statewide* class of mobility and visually impaired persons who alleged that "Caltrans has a 'centralized policy of 'discrimination' in violation of Title II,'" and the Rehabilitation Act, by making inaccessible "barriers along sidewalks, crosswalks, pedestrian underpasses, pedestrian overpasses and any other outdoor designated pedestrian walkways throughout the state of California…" *Id.* at 335-336. The district court did so even though the thousands of barriers were not identical and no named plaintiff claimed to have encountered every barrier. *Id.* at 344-45; *see also Gray v. Golden Gate National Recreational Area*, 279 F.R.D. 501, 510 (N.D. Cal. 2011) (certifying a class of all mobility impaired and visually impaired persons across the 75,000 acres of the Golden Gate National Recreation Area because all class members were affected by the same systemic access barriers). Named Plaintiffs raise essentially

the same question here for class-wide resolution, but on a far narrower, more modest scale.

Named Plaintiffs "[seek] certification on the grounds that architectural and policy barriers precluded their access." *See Lopez v. San Francisco Unified Sch. Dist.*, 2003 WL 26114018, at *3 (N.D. CA 2003). Courts in "this circuit as well as other circuits … have routinely held that class certification of classes composed of people with disabilities affected by … systemic access barriers is appropriate." *Id.*

### 3.     Plaintiffs' claims are typical of the class.

Rule 23(a)(3) typicality is satisfied where a named plaintiff's claims are "reasonably co-extensive" with absent class members' claims. *See Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998); *see also Rodriguez v. Hayes*, 591 F.3d 1105, 1124 (9th Cir. 2010). "The test of typicality 'is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct.'" *See Hanon v. Dataproducts Corporation*, 976 F.2d 497, 508 (9th Cir. 1992) (citation omitted).

Typicality is met here because Plaintiffs and the proposed Class assert the same claims arising from the same course of conduct: the City of San Diego's uniform policies which Plaintiffs allege create barriers to access and Plaintiffs' desire to access San Diego's public rights-of-way. Named Plaintiffs are people with disabilities. *See* Hinkle Decl., ¶ 3; Montoya Decl., ¶ 3 ECF; Pressel Decl., ¶¶ 3-4; Shirley Decl., ¶¶ 3-4; *see also* Menasche Decl., ¶ 14; Ex. K ("Hinkle Depo."), 13:3-5, 98:2-99:5. Named Plaintiffs' injuries arose in the same manner as every other Class Member, namely that the City's policies and lack of policies regarding dockless vehicles impeded their access to public rights-of-way based on their disabilities.[6] And the injury is the "same or similar," in that named Plaintiffs, like

---

[6] *See* Hinkle Decl., ¶ 4 ("Since the dockless scooters and bikes first appeared in San Diego in 2018 and continuing through the present, the pervasive presence of

**Memo. Of Points & Auth. iso Pls' Motion for Renewed Class Certification
Case No.: 3:19-cv-00054-JM-BGS**

the proposed Class, have had their access to sidewalks burdened in a way that is different from, and greater than, the access enjoyed by people without disabilities. Lastly, the City's actions and inactions with regard to dockless vehicles apply to all of the areas identified in the proposed class definition, not just to the Named Plaintiffs' individual situations. Typicality is met.

### 4.   Plaintiffs and Counsel Will Adequately Represent Class

Plaintiffs Mr. Montoya, Mr. Pressel, and Ms. Hinkle seek to be appointed as Class Representatives.[7] Rule 23(a)(4) requires Plaintiffs to show that "the representative parties will fairly and adequately protect the interests of the class." Class representatives are adequate when: (1) there is no conflict of interest between the representatives, their counsel, and absent class members; and (2) the representative and their counsel will "prosecute the action vigorously on behalf of the class." *Hanlon*, 150 F. 3d at 1020.

Here, Mr. Montoya, Ms. Hinkle, and Mr. Pressel's interests are aligned with those of the Class Members because they have been harmed by the same common misconduct and seek the same or similar relief. *See* Montoya Decl., ¶¶ 5-12, Pressel Decl., ¶¶ 3-18, , Hinkle Decl., ¶¶ 3-18. The Named Plaintiffs each claim the City's policies regarding its sidewalks violate the ADA and the Rehabilitation Act, and the City's dereliction of its duties denies equal, safe, and meaningful access and results in discrimination based on disability. These three Named Plaintiffs have actively participated in this litigation on behalf of the Class by consistently communicating with counsel; responding to discovery, and sitting for depositions. They are fully aware that they are pursuing this action as potential Class Representatives of a Class of City of San Diego residents with mobility

---

these vehicles parked on the City's sidewalks, bus stops and walkways have greatly interfered with my ability to safely and enjoyably walk and take the bus in the City.").

[7] Plaintiffs will not be seeking appointment of Mr. Shirley as class representative.

**Memo. Of Points & Auth. iso Pls' Motion for Renewed Class Certification
Case No.: 3:19-cv-00054-JM-BGS**

and/or visual impairments, and they are knowledgeable and informed about the claims in this action and the relief they are requesting. *See* Montoya Decl., ¶¶ 13-15, Pressel Decl., ¶¶ 19-21, Hinkle Decl., ¶¶ 19-21. Their interests are aligned with those of other Class Members, they have no conflicts of interest; thus, they are adequate and qualified to be appointed as Class Representatives. *Id.*

The Named Plaintiffs have retained counsel who have the resources and expertise to prosecute this action vigorously on behalf of the class.  Lead counsel Robert Frank of Neil, Dymott, Frank, McCabe & Hudson is a Senior Trial Attorney with over 40 years of experience and has tried over 75 jury trials.  Frank Decl., ¶¶ 1-8. Additional counsel of Neil, Dymott, Frank, McCabe & Hudson, Matthew Souther, is also well qualified. *See* Souther Decl., ¶¶ 1-12. Plaintiffs' counsel has aggressively pursued this case for the past two years, including by advancing over $11,483.48 in costs, engaging in extensive discovery and law-and-motion, and conducting depositions of City officials and defending depositions for proposed class representatives. *See* Souther Decl., ¶ 11.

Disability Rights California (DRC) is the country's largest disability rights legal organization. Ann Menasche, a Senior Attorney at DRC, has been litigating civil rights cases for over four decades and is an expert in the ADA and Rehabilitation Act. She has been sole or lead attorney in 10 jury trials and dozens of administrative hearings and court trials, and has argued cases before state appellate courts and the Ninth Circuit. She has been involved in obtaining four published decisions: *Bloom et al. v. City of San Diego*, No. 17-CV-2324-AJB-NLS, 2018 WL 9539239 (S.D. Cal. Aug. 21, 2018); *Arenas v. San Diego Cnty. Bd. of Supervisors*, 93 Cal. App. 4th 210 (2001); *Fry v. Saenz*, 98 Cal. App. 4th 256 (2002); and *Comm. to Defend Reproductive Rights v. A Free Pregnancy Ctr.*, 229 Cal. App. 3d 633 (1991). Additionally, she has been named class counsel on several cases. *See* Menasche Decl., ¶¶ 18-21. Two other attorneys assigned from DRC, Ben Conway and Autumn Elliott, are also highly qualified. *See* Declaration

21

of Ben Conway and Declaration of Autumn Elliott.

Plaintiffs and their counsel meet the Rule 23(a)(4) requirements.

### C.   The Requirements of Rule 23 (b)(2) are Satisfied.

A class action is proper where the party against whom relief is sought has acted (or refused to act) on grounds *generally* applicable to a class of persons, thereby making appropriate declaratory or injunctive relief with respect to the class as a whole. *See* Fed. R. Civ. P. 23(b)(2). The "Supreme Court has called '[c]ivil rights cases against parties charged with unlawful, class-based discrimination' … 'prime examples' of what (b)(2) is meant to capture." *Dukes II*, 564 U.S. at 361 (alteration in original) (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614 (1997)); *see also DL, et al. v. District of Columbia*, 860 F.3d 713, 726 (D.C. Cir. 2017) ("Rule 23(b)(2) exists so that parties and courts, especially in civil rights cases like this, can avoid piecemeal litigation when common claims arise from systemic harms that demand injunctive relief.");  *Brown v. D.C.*, 928 F.3d 1070, 1083 (D.C. Cir. 2019) (holding a (b)(2) class properly certified where disabled individuals receiving Medicaid-funded services alleged violations of Title II and Rehabilitation Act for failure to provide transition services to community-based care, leading to unnecessary isolation and segregation).

"Cases challenging an entity's policies and practices regarding access for the disabled represent the mine run of disability rights class actions certified under Rule 23(b)(2)." *Californians for Disability Rights, Inc. v. California Dep't of Transp.*, 249 F.R.D. 334, 345 (N.D. Cal. 2008). Indeed, in *Californians for Disability Rights*, the court certified a class consisting of the following:

"[a]ll persons with mobility and/or vision disabilities" who were allegedly "denied access under Title II of the Americans with Disabilities Act and the Rehabilitation Act of 1973 due to barriers along sidewalks, cross-walks, pedestrian underpasses, pedestrian overpasses and any other outdoor designated pedestrian walkways throughout the

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

> state of California which are owned and/or maintained by the California
> Department of Transportation."

*Id.* at 350. The court held that "the common question addressed by this lawsuit is whether and to what extent Caltrans has violated the ADA on a 'systematic basis for many years through the use of improper design guidelines and the failure to ensure compliance with even those deficient guidelines.' The question of such system-wide discriminatory practices is an issue common to all plaintiffs." *Id*. The same is true here.

Certification of a class under Rule 23(b)(2) does not require that every single class member must have been injured or aggrieved in the same way by defendant's conduct. A class may properly be certified if the opposing party's "action or inaction is directed to a class … even if it has taken effect or is threatened only as to one or a few members of the class, provided it is based on grounds which have general application to the class." Fed. R. Civ. P. 23(b)(2). Advisory Committee's Notes, 1966 Amendment. Thus, it is sufficient if the defendant has engaged in a pattern of activity that is "central to the claims of all class members irrespective of their individual circumstances and the disparate effects of the conduct." *Baby Neal for & by Kanter v. Casey*, 43 F.3d 48, 57 (3d Cir. 1994).

The City admits that it continues to permit dockless vehicles to be on the public rights-of-way, "pursuant to and within the limits set forth in the California Vehicle Code and the San Diego Municipal Code." Menasche Decl., ¶ 16; Ex. M (City's Responses to Plaintiffs' First Set of Requests for Admissions), at Request for Admission 1. Moreover, the numbers of complaints to the City through its "Get It Done" app has increased dramatically once again with the lifting of COVID-19 restrictions showing that the problem is ongoing and remains ubiquitous. *See* Freeman Decl. Further, despite contracting with Sweep, Inc. to remove dockless vehicles, the City has provided Sweep, Inc. with neither the resources nor the authority to adequately address the problem. As explained above, the City does not

23

allow immediate removal of those scooters parked in the middle of the sidewalk, nor blocking ramps despite the obstacles they pose for people with visual and mobility disabilities. *See also* Menasche Decl., ¶ 4; Ex. A, COSD- 20018-20025; discussion *supra* Section II.B.

Plaintiffs seek an injunction to ensure ADA compliance by prohibiting the City from authorizing or encouraging dockless vehicles to be stored and displayed on sidewalks, requiring effective methods of monitoring dockless vehicles that present barriers to access, and ensuring timely and effective enforcement policies. Such relief would significantly impact all San Diegans with mobility and/or visual impairments in the same manner: it would provide them the same freedom to safely and independently navigate the central areas of the City as people without disabilities enjoy. Plaintiffs further seek declaratory relief making clear the City's accessibility obligations.

## V.   THE COURT SHOULD DESIGNATE PLAINTIFFS' COUNSEL AS CLASS COUNSEL PURSUANT TO RULE 23(G)(1).

When a class is certified, the court must appoint class counsel (*See* Fed. R. Civ. P. 23(g)(1)) and the class certification order must list them. *See* Fed. R. Civ. P. 23(c)(1)(B). The Federal Rules list four factors the court must consider in appointing class counsel: "(i) the work counsel has done in identifying or investigating potential claims in the action, (ii) counsel's experience in handling class actions, other complex litigation, and claims of the type asserted in the action, (iii) counsel's knowledge of the applicable law, and (iv) the resources that counsel will commit to representing the class." *See* Fed. R. Civ. P. 23(g)(1)(A)(i)-(iv).

Pursuant to these four factors, Plaintiffs' counsel qualify for appointment as class counsel in this case. Plaintiffs have demonstrated the hard work their counsel has done on this action up until the present day. Counsel have interviewed and obtained declarations from Named Plaintiffs and other Class Members, obtained expert reports, defended six motions to dismiss, taken nine depositions, conducted

legal research, and gathered evidence. Plaintiffs' counsel have extensive knowledge and experience in handling class actions and other complex litigation, including ADA and civil rights cases, and are knowledgeable as to the applicable law. Plaintiffs' counsel fully intend to commit the necessary resources to represent the proposed class in this case. In short, the Court should appoint Plaintiffs' counsel as class counsel in its class certification order.

## VI.   <u>CONCLUSION</u>

For all of the above reasons, Plaintiffs' motion should be granted. Plaintiffs request the Court certify the proposed Class, designate Mr. Montoya, Mr. Pressel, and Ms. Hinkle as Class Representatives, and appoint Plaintiffs' counsel as Class Counsel.


Dated: July 9, 2021                              Respectfully submitted,


                                                 By:   /s Ann E. Menasche
                                                       Ann E. Menasche
                                                       Autumn M. Elliott
                                                       Ben Conway
                                                       DISABILITY RIGHTS CALIFORNIA

                                                       Attorneys for Plaintiffs